| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | FILE NO. 25CV050593-590 |

INLIVIAN, a body politic and corporate; FIRST WARD PLACE, LLC; and, FWP RECAP PHASE I, LLC, )
)
)
)
)
      Plaintiffs, )
)
      v.s. )
)
ELMINGTON PROPERTY MANAGEMENT, LLC, )
)
)
      Defendant. )
)

**COMPLAINT**

(INDEMNIFICATION, BREACH OF CONTRACT, FRAUD, FRAUDULENT MISREPRESENTATION, UNFAIR AND DECEPTIVE TRADE PRACTICES)

(Jury Trial Demanded)

**NOW COME** The Plaintiffs, INLIVIAN, First Ward Place, LLC and FWP Recap Phase I, LLC, complaining of the Defendant, and allege and say as follows:

PARTIES

1. Plaintiff INLIVIAN is a Housing Authority formed under the laws of the State of North Carolina and is a body politic and corporate with a principal place of business being located in Charlotte, North Carolina.

2. Plaintiff First Ward Place, LLC is a North Carolina Limited Liability Company with its principle place of business being located in Charlotte, North Carolina.

3. Plaintiff FWP Recap Phase I, LLC is a North Carolina Limited Liability Company with its principle place of business being located in Charlotte, North Carolina.

4. Defendant Elmington Property Management LLC is a foreign limited liability company formed under the laws of the State of Tennessee with a principal place of business in Nashville Tennessee.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to N.C. Gen. Stat § 7A-240 and N.C. Const. Art. IV, § 12, as this is a civil action involving legal entities located and doing substantial business within the State of North Carolina.

6. This Court has personal jurisdiction over Elmington Property Management LLC because it is a registered foreign Limited Liability Company subject to a contract and doing substantial business in Charlotte, North Carolina.

7. Venue is proper in the Superior Court of Mecklenburg County North Carolina pursuant to N.C. Gen. Stat. § 1-82; and, pursuant to N.C. Gen. Stat. § 1G-4(c) according to a forum selection clause executed by the parties consenting to Mecklenburg County, North Carolina as the exclusive venue for resolution of disputes between the parties.

## STATEMENT OF FACTS

8. On February 2021, First Ward Place, LLC entered into a Property Management Agreement ("PMA") with Elmington Property Management LLC ("Elmington") for the management of 283 units in First Ward Place located in Charlotte, North Carolina ("First Ward Place"). This PMA was amended in July of 2022 to reduce the number of units under management to 212. The 71 units removed from the original PMA were acquired by FWP Recap Phase I, LLC ("FWP Recap"). Elmington later entered into a PMA to manage the 71 units acquired by FWP Recap.

9. The PMAs required Elmington to furnish monthly site activity reports, maintain the property in good repair, complete preventative maintenance activities, systematically receive and investigate service requests, complete routine work orders within 10 days, and complete emergency work orders within 24 hours.

10. The PMAs specifically required Elmington to "[M]aintain the Property in good repair in accordance with (i) the terms of this Agreement, the Housing Assistance Payment Agreement, and the Management Plan; (ii) all applicable rules, ordinances, regulations and laws; and (iii) the reasonable expectations of Owner." In addition to completing "preventative maintenance activities on a regular basis, in the most cost-effective manner possible."

11. Elmington also entered into a Management and Transition Plan ("Management Plan") with INLIVIAN (by and through Horizon Development Properties) which was expressly incorporated into the PMAs.

12. The Management Plan specifically set forth the respective obligations and responsibilities of Elmington and INLIVIAN in administering the Housing Assistance Payment ("HAP") contract. As such, INLIVIAN was a direct third-party beneficiary of the PMAs with statutory obligations and responsibilities flowing from their contracts and funding received from the Department of Housing and Urban Development ("HUD").

**WORK ORDER DISCREPANCIES**

13. In November 2023, residents contacted INLIVIAN reporting frequent work order issues, including non-responsiveness and repeated resubmissions. As a result of these complaints Timica Melvin ("Ms. Melvin") the Project-Based Voucher ("PBV") Manager for INLIVIAN retrieved Elmington's detailed work order data and discovered discrepancies between reported and actual completion times.

14. The detailed data obtained by Ms. Melvin revealed that approximately 17% of routine work orders failed to be completed within the required 10-day timeframe.

15. Numerous residents experienced extended periods without essential services such as heating, air conditioning, and hot water. For example, residents Shamica Colwell and Leo

Caldwell had no HVAC for more than a month in August and September 2023; Genosia Sturdivant was without heating for 137 days beginning in early December 2023; Mohamed Alhaja had an inoperable stove burner for 329 days; Ryan Ramsey was without hot water for six (6) months; Katheleen Gray and Daniel Mullan's A/C unit was inoperable for 98 days; and, Teresa Surall was without heating for 3 weeks in January of 2024.

16. It seems that Elmington lacked a centralized system for tracking work orders and maintenance staff often addressed issues only when residents approached them directly. On many occasions residents were required to resubmit work orders due to Elmington's unreliable records.

17. At the end of April 2024, 17% of all urgent work orders ever received were still open, with urgent issues languishing for weeks and months.

18. Blue Horizon Management Company ("Blue Horizon") took over management of the property, and discovered numerous longstanding work order issues that Elmington had failed to address.

19. Blue Horizon's promptness in completing these longstanding work orders highlighted Elmington's contract breaches and negligence.

**RESULTING LITIGATION**

20. Another example of Elmington's failure to timely address work orders involves a resident named Shakeena Russell ("Ms. Russell"). Ms. Russell lived at 651 E. 8th Street Apt. 307 (17-307) from May 2021 until April 2024, when she was relocated due to longstanding habitability issues.

21. Starting in late 2021, Ms. Russell repeatedly complained to Elmington's Community Director, Renee Carlton, about animals infiltrating her attic. The animals caused constant noise disturbing her sleep and peace of mind, damage to wiring, AC filter, ductwork, and

4

the roof, leading to water leaks; and, defecation in the attic, creating a noxious odor throughout her unit.

22. Elmington neglected to create a work order or take any action to remediate Ms. Russell's complaints. As a result, in mid-2022, Ms. Russell contacted Charlotte Code Enforcement, which issued a notice of violation in September of 2022. Elmington still did not address the issue.

23. Even further, Elmington <u>falsely</u> reported in October 2023 that a work order for "Animals behind circuit breaker wall and ceiling again" was completed in 9 days, though the issue persisted for 6 more months.

24. Ms. Russell's issues were ultimately addressed 2.5 years after her initial complaint when she was relocated, and her unit was repaired. As a result, Ms. Russell filed a lawsuit against INLIVIAN in May of 2024, alleging failure to maintain a habitable unit and an illegal "self-help" eviction.

25. Elmington was in material breach of the PMA in light of their failure to report Ms. Russell's repeated complaints to First Ward Place, LLC, as required under the PMAs; failure to timely cure substantial building code violations within 2 months of notice; and, negligence in tracking and addressing work orders.

26. INLIVIAN settled the case with Ms. Russell for $9,000.00 and is entitled to indemnification from Elmington for costs, including reasonable attorney's fees incurred due to Elmington's negligence and/or willful misconduct.

27. The Russell case exemplifies Elmington's broader failures in property management and raises questions about its work order tracking system.

5

**MOLD ISSUES**

28. During its tenure Elmington failed to timely address significant mold issues in several units, leading to substantial remediation costs for First Ward Place LLC. Indeed, Blue Horizon spent $15,650.00 in the first three (3) months of their tenure hiring contractors for mold remediation in First Ward Place units.

29. INLIVIAN incurred substantial costs in 2023 to remediate severe mold in FWP Recap units that Elmington had failed to report. Indeed, it was discovered that as early as September of 2022, Cleveland Construction discovered severe mold in 11 FWP Recap units that Elmington had failed to report FWP Recap or INLIVIAN.

30. Ultimately INLIVIAN (by and through HDP) spent approximately $440,000.00 to remediate FWP Recap units and prepare them for rehabilitation due to Elmington's negligence.

31. Elmington's failure to responsibly manage and maintain the property has resulted in significant costs and potential legal exposure for INLIVIAN, First Ward Place, LLC and FWP Recap Phase I, LLC.

32. Plaintiffs and Elmington entered into the PMAs willingly and with advice of counsel. The PMAs contained an express mutual indemnification clause.

33. In pertinent part the indemnification clause states: "Agent shall indemnify and hold harmless Owner, its members, managers, officers, directors, and employees from any and all liabilities, claims, actions, judgments, awards, settlement amounts, and costs and expenses, including but not limited to, reasonable and actual attorney's fees arising out of or resulting from acts or omissions of Agent I) that constitute negligence or willful misconduct, and/or (ii) that constitute a breach of any term of this Agreement, provided such acts or omissions are not caused in whole or in part by Owner." Reciprocal covenants are set forth in favor of Elmington.

34. Demand was made of Elmington for indemnity in the amount of $422.848.18 related to the settlement of the Russell matter and mold remediation necessitated by Elmington's acts and/or omissions. Elmington has failed to indemnify Plaintiffs as required by the indemnification clause.

35. Plaintiff has suffered damages in the amount of $422,848.18 as a result of Elmington's failure to indemnify.

## CLAIMS FOR RELIEF

### Count I
(Indemnification & Declaratory Judgment)

36. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 35 as if fully set forth herein.

37. Plaintiffs and Elmington entered into valid PMAs which included mutual indemnification clause as stated in paragraph 33 of this Complaint.

38. Plaintiffs made demand upon Elmington on August 7, 2025 and; as of this date, Elmington has failed and/or refused to indemnify Plaintiffs according to the express terms of the PMAs.

39. Plaintiffs have suffered damages in the amount of $422,848.18 as a direct result of Elmington's acts and omissions.

40. Plaintiffs are entitled to a judgment directing indemnification from Elmington in the amount of $ $422,848.18.

41. At present an actual controversy exists between Plaintiffs and Elmington regarding the interpretation and enforcement of the indemnification clause in the PMAs.

42. The controversy is ripe for judicial determination as Elmington has failed to indemnify Plaintiffs as required by the clause.

7

43. Plaintiffs have standing to seek a declaratory judgment as it is a party to the agreement and is directly affected by Elmington's failure to indemnify.

44. Plaintiffs seek a declaration from this Court regarding the rights and obligations of the parties under the indemnification clause.

## Count II
### (Breach of Contract)

45. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 44 as if fully set forth herein.

46. A valid contract existed between INLIVIAN, First Ward Place LLC, FWP Recap Phase I, LLC and Elmington Property Management LLC.

47. The Property Management Agreements entered into in February 2021, with subsequent amendments in May 2022 and July 2022, constituted binding contracts between the parties.

48. Defendant breached the express terms of the contract by failing to:

   a. Furnish monthly site activity reports with previous month's data on work orders and "significant or repeated resident complaints."

   b. "[M]aintain the Property in good repair in accordance with (I) the terms of this Agreement, the Housing Assistance Payment Agreement, and the Management Plan; (ii) all applicable rules, ordinances, regulations and laws; and (iii) the reasonable expectations of Owner."

   c. "[C]omplete preventative maintenance activities on a regular basis, in the most cost-effective manner possible."

   d. "[S]ystematically receive and investigate all service requests from residents."

   e. Complete routine work orders <u>within 10 days</u>.

   f. Complete and report to FWP LLC emergency work orders <u>within 24 hours</u>.

g. Periodically inspect units to determine compliance with UPCS, NSPIRE, and HQS and "identify any unreported maintenance or resident damages."

h. Cure all "substantial building code violation[s]" within two months of government notice.

49. Elmington failed to complete routine work orders within the required 10-day timeframe, with approximately 17% of routine work orders exceeding this limit. Indeed, these failures included the following particularly egregious breaches, to wit:

a. Residents Shamica Colwell and Leo Caldwell each had no HVAC for more than a month in August and September 2023.

b. Resident Genosia Sturdivant was without heating for 137 days beginning early December 2023—the entirety of winter.

c. Resident Teresa Surall was without heating for 3 weeks in January 2024.

d. Resident Mohamed Alhaj had a work order for an inoperable stove burner that had been open for 329 days.

e. Resident Ryan Ramsey was without hot water for 5 months.

f. Residents Kathleen Gray and Daniel Mullan had, as of April 2024, a work order for an inoperable AC unit that had been open for 98 days, and a work order for lack of heating that had been open for 87 days. They resubmitted the work order in August 2024, and Blue Horizon completed it on the same day.

g. Multiple other residents created work orders at the start of winter 2023 for lack of heating that were never addressed by Elmington.

50. Elmington failed to complete urgent work orders within the required 24-hour timeframe, with 17% of all urgent work orders still open at the end of April 2024.

51. Elmington failed to perform recertification of residents occupying Project-Based Vouchers ("PBV") as required under the PMAs. Specifically, Elmington failed to timely perform recertifications of resident of PBV units; and to timely retain on-site personnel with sufficient training to conduct resident recertifications.

52. The PMA's required Elmington to:

   a. Have, by February 2022, one or more on-site staff members certified or trained in conducting Project-based Voucher management certification.

   b. "[U]se diligent efforts in accordance with customary business practices to maximize occupancy at the Project" (including marketing and advertising); negotiate and execute resident leases; and collect all rents and other income due to the Project.

   c. "[C]onduct tenant income re-certifications and obtain such other information as may be required with respect to tenants in any of the units on the Property."

   d. "[D]iligently and in good faith seek to protect the property rights and interests of Owner, to promote the best economic interests of Owner in its ownership and operation of the Property, and to manage the Property in accordance with normal and accepted standards."

53. INLIVIAN, as the Housing Assistance Payment ("HAP") Administrator, contracted with Elmington to perform these certifications, and Elmington failed to timely retain on-site personnel with sufficient training to adequately perform these duties.

54. Indeed, fifty-five (55) residents of PBV units were required to be recertified during Elmington's management of the Properties. Elmington only timely certified 2 of 55 PBV residents.

55. Elmington failed to maintain the property in good repair, as evidenced by the numerous unaddressed maintenance issues discovered when replaced by Blue Horizon Management Company.

56. Plaintiffs suffered damages as a result of Defendant's breach.

57. Plaintiffs incurred substantial costs for mold remediation, including $15,650 spent by Blue Horizon in the first three months of management.

58. INLIVIAN incurred significant costs in 2023 to remediate severe mold in FWP Recap units that Elmington failed to report.

59. INLIVIAN (by and through HDP) spent approximately $440,000 to remediate FWP Recap units and prepare them for rehabilitation due to Elmington's negligence.

60. INLIVIAN paid $9,000.00 to settle a case as the direct and proximate result of Elmington's failure to provide the services contracted for under the PMAs.

## Count III
(Fraud)

61. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 60 as if fully set forth herein.

62. Defendant made false representations of material fact to Plaintiffs.

63. Elmington consistently reported completing routine work orders within 10 days and urgent work orders within 24 hours. These reports were false, as evidenced by the detailed data obtained in January 2024 showing significant discrepancies in actual completion times. Specifically:

   a. Elmington's October 2023 report stated the average days to complete routine work orders was 5, 3 and 8 for the respective PMA's when in fact the detailed work order information retrieved from Elmington's Fortress System showed the actual days to complete routine work orders were 13.5, 17 and .5 for the respective PMA's.

   b. Elmington's November 2023 report stated the average days to complete routine work orders was 5, 3 and 8 for the respective PMA's when in fact the detailed work order information retrieved from Elmington's Fortress System showed the actual days to complete routine work orders were 16.6, 16.2 and 32.5 for the respective PMA's.

   c. Elmington's December 2023 report stated the average days to complete routine work orders was 7, 7 and 4 for the respective PMA's when in fact the detailed work order information retrieved from Elmington's Fortress System showed the actual days to complete routine work orders were 12, 15.6 and 7.6 for the respective PMA's.

   d. Elmington failed to file reports in February or March of 2024; however, Elmington's Fortress System showed the completion time for routine work orders for the respective PMA's at 15.6, 26.6 and 2 for February and 20, 24, and 6 for March.

64. Defendant knew its representations were false or made them with reckless disregard for their truth.

65. Elmington had access to the actual work order data and knew or should have known that their reports were inaccurate.

66. Defendant intended, and in fact did, deceive Plaintiffs with these falsified reports.

67. By falsely reporting work order completion times, Elmington intended to create the impression that they were fulfilling their contractual obligations and managing the property effectively.

68. Plaintiffs reasonably relied on Defendant's false representations.

69. Plaintiffs relied on Elmington's reports to assess the performance of the property management company and the condition of the property.

70. Plaintiffs suffered damages as a result of their reliance on Defendant's false representations.

71. Due to Elmington's false reporting, maintenance issues went unaddressed, leading to increased remediation costs and potential legal exposure. Plaintiffs incurred substantial costs to remediate mold and repair units that Elmington had falsely reported as being in good condition.

## Count IV
(Fraudulent Misrepresentation)

72. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 71 as if fully set forth herein.

73. Defendant made false representations of material fact to Plaintiff.

74. Elmington consistently reported completing routine work orders within 10 days and urgent work orders within 24 hours.

75. These reports were false, as evidenced by the detailed data obtained in January 2024 showing significant discrepancies in actual completion times.

76. Defendant knew its representations were false or made them with reckless disregard for their truth.

77. Elmington had access to the actual work order data and knew or should have known that their reports were inaccurate.

78. Defendant intended to deceive Plaintiff with these false misrepresentations.

79. By falsely reporting work order completion times, Elmington intended to create the impression that they were fulfilling their contractual obligations and managing the property effectively.

80. Plaintiffs reasonably relied on Defendant's false representations.

81. Plaintiffs relied on Elmington's reports to assess the performance of the property management company and the condition of the property.

82. Plaintiffs suffered damages as a result of their reliance on Defendant's false misrepresentations.

83. Due to Elmington's false reporting, maintenance issues went unaddressed, leading to increased remediation costs and potential legal exposure.

84. Plaintiffs incurred substantial costs to remediate mold and repair units that Elmington had falsely reported as being in good condition.

### Count V
(Unfair and Deceptive Trade Practices)

85. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 84 as if fully set forth herein.

86. Defendant engaged in unfair and deceptive acts or practices in or affecting commerce.

87. Defendants' unfair and deceptive acts include concealing and misrepresenting the status of outstanding work orders, concealing environmental concerns with rental units they were contracted to maintain and failing to inform the Plaintiffs of the need for remediation.

88. These acts occurred in the context of a commercial transaction for the management and maintenance of hundreds of affordable rental units.

89. Defendant's unfair and deceptive acts proximately caused injury to Plaintiffs by resulting in the expenditure of more than $400,000.00 to remediate mold and to settle past and future litigation because of the uninhabitable condition of the units. Indeed, but for the false, misleading and malicious acts of the Defendant, Plaintiffs would have terminated the PMAs much earlier.

**WHEREFORE**, Plaintiffs pray for relief as follows:

1. Judgment declaring specific performance of the indemnification clause including payment to INLIVIAN in the amount of $422.848.18;

2. Compensatory damages against Elmington in an amount in excess of $25,000 to be proven at trial;

3. For reasonable and actual attorneys' fees as provided for in the indemnification clause and authorized pursuant to N.C. Gen. Stat. § 6-21.6

4. Punitive damages against Elmington in an amount to be determined at trial;

5. Treble damages pursuant to N.C. Gen. Stat. § 75-1.1;

6. Pre-judgment and post-judgment interest as allowed by law;

7. The costs of this action;

8. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

This the 23rd day of September, 2025.

                                              /S/ Bryan E. Wardell
By:   Bryan E. Wardell
      N.C. State Bar # 20693
      BKC Advisors, PLLC
      *Attorneys for the Plaintiffs*
      8601 Six Forks Rd, Ste 400
      Raleigh, NC 27615
      Phone: 919-446-3994
      Fax: 919-295-9967
      bwardell@bkc-advisors.com